# United States District Court

DISTRICT OF

Rhode Island

CA 07 410

#

P2/16-0839A
RICARDO
HERNANDEZ )

V. )

A.T. WALL et, al. )

PETITION FOR WRIT OF HABEAS CORPUS 28 USC SECTION 2254.

## Jurisdiction Of Matter.

The petitioner invokes all pendant jurisdiction, federal mandates and post-conviction precepts that govern USC § 2254.

## TIME CONSTRAINTS

Any time constraints or untimely filing issues are barred based on the (protectections) outlined in COLEMAN V. THOMPSON 11 S.Ct. 2546. where valid constitutional claims are raised to a level where justice must be served by entertaining the meritts. (See Attached Memorandum).

## TRAVEL OF CASE AND INTRODUCTION.

The matter before this Honorable Court concerns (severance). Three seperate indictments were consolidated giving rise to predjudicial appearence.

## TABLE OF AUTHORITIES

PAGE

### CONSTITUTIONS, STATUTES AND RULES

G.L. 1956 (1994 Reenactment) § 11-47-5 .......... 24, 26

R.I. R. Evid. 404(b) .......... 9 et passim

Super. R. Crim. P. 8 .......... 11

Super. R. Crim. P. 8(a) .......... 9 et passim

Super. R. Crim. P. 8(b) .......... 21, 22, 24, 28

Super. R. Crim. P. 13 .......... 9 et passim

Super. R. Crim P. 14 .......... 11, 26, 28

### UNITED STATES COURTS OF APPEALS CASES:

United States v. Acker, 52 F.3d 509 (4th Cir. 1995) .......... 13

United States v. Chambers, 964 F.2d 1250 (1st Cir. 1992) .......... 13

United States v. Dominguez, 226 F.3d 1235 (11th Cir. 2000) .......... 21, 22

United States v. Edgar, 82 F.3d 499 (1st Cir. 1996) .......... 13, 24-25

United States v. Foutz, 540 F.2d 733 (4th Cir. 1976) .......... 18, 20, 21

United States v. Frost, 125 F.3d 346 (6th Cir. 1997) .......... 13, 22, 28

United States v. Miller, 449 F.2d 974 (D.C. Cir. 1971) .......... 18, 19, 23

United States v. Nguyen, 88 F.3d 812 (9th Cir. 1996) .......... 24

United States v. Plache, 913 F.2d 1375 (9th Cir. 1990) .......... 27

United States v. Satterfield, 548 F.2d 1341 (9th Cir. 1977) .......... 22

United States v. Taylor, 54 F.3d 967 (1st Cir. 1995) .......... 13, 23, 24

United States v. Vasquez-Velasco, 15 F.3d 833 (9th Cir. 1994) .......... 24

United States v. Werner, 620 F.2d 922 (2d Cir. 1980) ........................................13, 25, 28

UNITED STATES DISTRICT COURT CASES:

United States v. Buchanan, 930 F. Supp. 657 (D. Mass. 1996)................................13, 18

RHODE ISLAND CASES:

State v. Bernier, 491 A.2d 1000 (R.I. 1985) ........................................ 11, 13, 14, 17, 22

State v. Cassey, 543 A.2d 670 (R.I. 1988)..............................................................13

State v. Cline, 122 R.I. 297, 405 A.2d 1192 (1979) ..................................11 et passim

State v. Evans, 742 A.2d 715 (R.I. 1999) ...........................................................21, 25

State v. Fillion, 785 A.2d 536 (R.I. 2001) ...................................................12, 13, 27

State v. Humphrey, 715 A.2d 1265 (R.I. 1998) .......................................................25

State v. King, 693 A.2d 658 (R.I. 1997).......................................................22, 23

State v. Lamoureux, 623 A.2d 9 (R.I. 1993)...........................................................19

State v. LaRoche, 683 A.2d 989 (R.I. 1996)...............................................11, 13, 24

State v. Lassor, 555 A.2d 339 (R.I. 1989) ...........................................13 et passim

State v. Lemon, 497 A.2d 713 (R.I. 1984)........................................................18, 21

State v. Martinez, 774 A.2d 15 (R.I. 2001)...........................................................24

State v. Nardolillo, 698 A.2d 195 (R.I. 1997) .......................................................20

State v. Raymond, 446 A.2d 743 (R.I. 1982) .........................................................25

State v. Rice, ___ A.2d ___, No. 2001-173-C.A. (R.I. Feb. 10, 2003)..............................20

State v. Rice, 755 A.2d 137 (R.I. 2000)...............................................12, 13, 23

State v. Romano, 456 A.2d 746 (R.I. 1983) ....................22

State v. Trepanier, 600 A.2d 1311 (R.I. 1991) ....................12

State v. Whitman, 431 A.2d 1229 (R.I. 1981) ....................13 et passim

State v. Young, 414 A.2d 185 (R.I. 1980) ....................27

## CASES FROM OTHER JURISDICTIONS:

Arnold v. United States, 358 A.2d 335 (D.C. 1976) .................... 17

King v. State, 518 So.2d 880 (Ala. Ct. Crim. App. 1987) ....................16, 19, 20, 24

McKnight v. State, 375 A.2d 551 (Md. 1977) ....................20, 21

State v. Bradley, 414 A.2d 1236 (Me. 1980) ....................27

## MISCELLANEOUS AUTHORITIES:

1A Charles Alan Wright, Federal Practice & Procedure: Criminal 3d
(3d ed. 1999) ....................12, 13, 18, 22

## QUESTIONS PRESENTED

I. *Joinder of Offenses under Super. R. Crim. P. 8(a) and 13*: Defendant attacked three women in a similar manner, using the same car. The striking similarity of the attacks led the police to connect the three events and look for the same suspect in each one. Was it a violation of Super. R. Crim. P. Rules 8(a) and 13 to join the three cases for trial? Was defendant prejudiced by the joinder?

II. *Prejudicial Joinder under Super. R. Crim. P. 14*: Can defendant argue that the court erred by not severing the cases under Super. R. Crim. P. 14 when the issues was not raised below? If defendant was not prejudiced by joinder under Rules 8(a) and 13, can he still seek severance under Rule 14?

II. DISCUSSION

**A. Motion for severance**

*HN1*We review a district court's denial of a motion to sever for abuse of discretion. *United States v. Wiseman*, 172 F.3d 1196, 1211 (10th Cir. 1999). Under **[**4]** this standard, a defendant must demonstrate that his right to a fair trial was threatened or actually deprived. *See United States v. Johnson*, 130 F.3d 1420, 1427 (10th Cir. 1997). A defendant's burden to show an abuse of discretion in this circumstance "'is a difficult one.'" *United States v. Janus Indus.*, 48 F.3d 1548, 1557 (10th Cir. 1995) (quoting *United States v. Valentine*, 706 F.2d 282, 290 (10th Cir. 1983)).

*HN2*When joinder of offenses is based upon their "same or similar character," prejudice to the defendant is more likely because the jury may use evidence of one crime to infer a criminal disposition on the part of the defendant and thus corroborate the commission of the other crime or **[*836]** crimes charged. *See United States v. Muniz*, 1 F.3d 1018, 1023 (10th Cir. 1993). We have suggested, however, that prejudice does not exist unless the evidence is "too confusing or unfairly overlapping." *Id.*

*HN3*A defendant who wishes to remain silent on some counts and testify on other counts is not entitled to a severance under Fed. R. Crim. P. 14 without "'a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other.'" *United States v. Martin*, 18 F.3d 1515, 1518-19 (10th Cir. 1994) (quoting *Valentine*, 706 F.2d at 291). In making such a showing, the defendant must

# TRAVEL OF THE CASE

Indictment K1/96-0081A charged the appellant, Ricardo Hernandez with first-degree sexual assault (count 1) and second-degree sexual assault (counts 2 and 3) against Lori Thorpe on December 19, 1995. Information P2/96-0839A charged Mr. Hernandez with felony assault with a device similar to a firearm (i.e., a pellet gun) upon Amber Newberry on January 1, 1996. Indictment K1/96-0095A charged Mr. Hernandez with several offenses against Lisa Torres on January 15, 1996: assault with intent to murder (count 1), assault with intent to rob (count 2), possession of a firearm (pellet gun) after a prior violent crime conviction (count 3), and kidnapping (count 4).

The state filed a motion to consolidate the charges on January 31, 1997, which the Honorable Superior Court Justice Clifton granted over the defense's objection on March 31, 1997. On February 3, 1998, the Honorable Justice Hurst denied the defense's motion to sever Indictment K1/96-0095A and several motions in limine (denied in part). On February 12, 1998, Justice Hurst also denied the defense's motion to suppress identification of Mr. Hernandez.

A jury trial took place September 8 through 11, and 14, of 1998, the Honorable Justice Krause, presiding. On September 14th, the jury returned guilty verdicts on all offenses except on the kidnapping charge (count 4 in K2/96-0095A), which Justice Krause dismissed by grant of a judgment of acquittal before jury deliberation.

Justice Krause heard and denied Mr. Hernandez's motion for new trial on September 22, 1998. On October 28, 1998, Justice Krause sentenced Mr. Hernandez. In K1/96-0081A, Mr. Hernandez received fifty years with forty to serve and ten suspended with probation on count 1, and fifteen years to serve on counts 2 and 3. In P2/96-0839A,

Justice Krause imposed the maximum penalty of three years to serve. In K2/96-0095A, the sentence was twenty years to serve on count 1, fifteen years to serve on count 2, and ten years to serve on count 3. Each sentence within a charging document runs concurrently. However, the sentences in K1/96-0081A run consecutive to those in P2/96-0839A, which are consecutive to those in K2/96-0095A. Finally, Justice Krause ordered all of the sentences to run consecutive to a sentence that Mr. Hernandez was already serving in P1/88-4602.

Timely notices of appeal were filed on October 28, 1998. This Honorable Court docketed the appeal on May 12, 2000, placing the case on the full-brief tract in accordance with Mr. Hernandez's waiver of the pre-briefing process as allowed by Supreme Court Article I, Rule 16(i). On March 14, 2001, this Court granted Mr. Hernandez's motion to hold his appeal in abeyance pending receipt of supplemental transcripts that were eventually filed on May 8, 2001. Additional hearing dates later discovered missing were ordered on May 29, 2002 and were filed in the Supreme Court on June 4, 2002.

## STATEMENT OF FACTS

On December 19, 1995, Lori Thorpe left her residence at the Alpine Motel in Smithfield at night in blizzard-like and very treacherous conditions with plans to walk to her father's house on near Union Avenue in Cranston to ask him for food. (TT I, 48,136,143) Thorpe, a cocaine addict, and her male roommate often ran out of food after paying the motel rent and using the remainder of her roommate's monthly SSI check to buy drugs. (TT I, 48, 50, 74-76) Thorpe knew that it would take hours to walk to her father's house. (TT I, 80)

When Thorpe reached Douglas Pike near her motel, she hitched a ride from a couple who dropped her off near Union Avenue close to her father's house. (TT I, 82) Although she was "starving" and "desperate," Lori claimed that instead of going to her father's house nearby to get food, she changed her mind because she believed her father would yell at her because it was 9:00 p.m. (TT I, 50, 79) She did not go to her father's despite the fact that he always gave her food when she asked. (TT I, 75)

Unable to hitch a ride back, Thorpe walked to the Foxy Lady adult entertainment club on Douglas Avenue because she used to work there as an "entertainer" and figured she could find a ride home. (TT I, 87-88) After walking two to three hours, Thorpe reached the Foxy Lady and discovered that it had closed early. (TT I, 51) Thorpe had given up hitchhiking when a man Thorpe thought might be Hispanic, pulled over in what she recalled was a black or burgundy two-door and two-seater sports car to offer her a ride. (TT I, 52, 88)

Thorpe took the offer for a ride and claimed she asked the driver to take her to Mineral Spring Avenue where Thorpe planned to ask some people she knew for another

ride. (TT I, 52) Instead, the man got on the highway. (TT I, 53) Thorpe said she protested and asked to get off at Atwells Avenue. (TT I, 54) The driver told Thorpe that he was going to Warwick to see a friend and ignored Thorpe's requests to take her home. (TT I, 54)

Thorpe testified that the car was traveling very slowly because the highway was covered with snow. (TT I, 55, 89) There were a lot of other cars traveling on the highway and they were also traveling very slowly. (TT I, 55, 89) Despite the snail's pace of the car and the multitude of other drivers on the highway, Thorpe never tried to leave the car. (TT I, 93) The door on Thorpe's side of the car was unlocked. (TT I, 90)

The driver exited the highway in Warwick and drove to an apartment complex said that his friend was not home, and then drove to a nearby industrial area. (TT I, 91) Thorpe saw a plow truck with a driver just inside the entrance of the industrial park area but she still did not try to leave the car. (TT I, 56, 93) While parked, the driver then told Thorpe that they were going to "take care of business" and pulled down his pants. (TT I, 59, 94) Thorpe then opened the car door but when the man put his hand on his shoulder and used a strong of voice, Thorpe felt that she had to get back in the car. (TT I, 58-59) She did so despite the fact that she had pulled away from the driver and had a foot out of the door. (TT I, 58) Thorpe claimed that the driver forced her to perform fellatio on him, bringing him to climax, by guiding her head to his genitals. (TT I, 60, 96) Thorpe also claimed that the driver then touched her rear end and breasts underneath her clothing before telling her in a cold voice to leave the car. (TT I, 62, 96)

After leaving the car, Thorpe immediately ran up to the plow truck driver and told him of the assault. (TT I, 96-97) The truck operator offered to call the police but Thorpe

refused, claiming that she just wanted to go home. (TT I, 64-65) The tow truck operator called the police anyway. (TT I, 64-65)

At the station Thorpe gave the police a hard time, yelling at the police and refusing a ride home from police. (TT I, 66,100,132-33,138) Instead, Thorpe walked to a nearby Dunkin' Donuts where she approached a total stranger in a van, and got a ride home. (TT I, 101-02) Thorpe caused such a scene and was so uncooperative at the police station, failing to adequately answer basic questions about where she was coming/going that night, why she was with the suspect, and information about the suspect, himself, that the police classified her complaint as unfounded that night. (TT I, 136-38) Eventually, when Thorpe decided to cooperate and look at a photo array, she selected the defendant's photograph after reviewing the array for at least 30 seconds, which officer Kevin Mowry testified was notable because most people select photos immediately. (TT I, 162-63) One week before trial, during a meeting with the prosecutor, Thorpe selected a totally different suspect out of the photo array as the prosecutor flipped through the file. (TT I, 104-06)

The evidence that the state presented at trial regarding Lori Thorpe related only to her case, without mention of the others.

The second case that the state presented at trial related solely to Amber Newberry. Newberry had been working for some time as a prostitute when, on the morning of January 1, she stood on the corner of Bucklin Street in South Providence. (TT II, 338-40,354) A man that Newberry said looked Latino, pulled over in a red sports car, and after asking Newberry if she was working, Newberry said she was, and got in the car. (TT II, 339-40,354) The driver drove about 2-1/2 miles to a two-way residential street

near Roger Williams Park and parked. (TT II, 340,353,355) The two discussed money and the man told Newberry that he did not have any. (TT II, 341,357) When Newberry told him she could not help him, the man pulled out a gun from between the driver's seat and door, and pointed it at Newberry's face and told her he would shoot if she opened the door. (TT II, 341-42,359) Newberry testified that that gun was large and silver. (TT II, 347) She also testified that she knows the difference between a revolver and an automatic and that the gun looked like an automatic 6-8 inches long. (TT II, 347-48) Newberry managed to escape when the driver became distracted by a passing car. (TT II, 342) The driver did not fire the gun. (TT II, 342)

Newberry reported the incident to police later that day and gave a written, signed, two-page statement at the station. (TT II, 344) Newberry, who told the police that she had been prostituting, never heard from police after that. (TT II, 344) On January 16 Newberry saw a news report about a crime involving Lisa Torres on the day before, and mention of a small, red sports car that the assailant drove. (TT II, 351,361-64) Because Newberry's assailant drove a small, red sports car, Newberry called the police to ask about her previously filed complaint and discovered the police had lost it. (TT II, 351) Newberry went back to the station to re-file her complaint. (TT II, 351)

The state called no other witnesses regarding Newberry's case.

The third complainant, Lisa Torres, was also working daily as a prostitute in January 1996 to support a long-standing cocaine habit. (TT I, 168-69,196,198) On the night of January 15, Torres was working on Hanover Street in Cranston near Elmwood Avenue when she was picked up by an apparent customer. (TT I, 169-70,172) Torres described the man as a tall Puerto Rican with a receding hairline. (TT I, 174,199,216-17,

II 230) When Torres got in the car she saw a gun in the driver's jacket, which Torres described as a small, gray .22 caliber weapon. (TT I, 191) The man got on the main highway then got off at exit 10 and drove to a deserted and dark factory area on Gilbane Street in Warwick. (TT I, 201) Torres testified that the man parked, and then asked Torres to perform fellatio and when she refused, he told her to get out of the car. (TT I, 177-78) However, the parties stipulated to the fact that Torres' oral and written statements to police on two separate occasions made no mention of the man asking her to perform fellatio. (TT I, 206) Once outside of the car, Torres removed her jacket at the man's request and the man demanded money, while he searched her clothes. (TT I, 178-79,181-82) Finding none, the man shot Torres in the left eye and Torres fell to the ground. (TT I, 182-83) The man then kicked and punched Torres and shot her in the head again before leaving. (TT I, 183) After the man had left, Torres got up and walked for a couple of minutes before she encountered a security officer who called the police. (TT I, 183)

The police never recovered a weapon and there was no tangible evidence that linked the defendant to any of the crimes.

Additional facts are contained in the Argument section where necessary to further develop the issues raised on appeal.

# ARGUMENT

I. THE TRIAL COURT ERRED AS A MATTER OF LAW IN JOINING FOR TRIAL THE SEXUAL ASSAULT OFFENSES IN INDICTMENT K1/96-0081A, THE FELONY ASSAULT OFFENSE IN INFORMATION P2/96-0839A, AND THE VARIOUS FELONY OFFENSES IN INFORMATION K2/96-0095A, THAT STEMMED FROM THREE SEPARATE CRIMES COMMITTED WEEKS APART AGAINST THREE DIFFERENT WOMEN; BECAUSE THE MISJOINDER WAS NOT HARMLESS, MR. HERNANDEZ IS ENTITLED TO A NEW TRIAL ON ALL COUNTS.

## The Proceedings Below

Indictment K1/96-0081A filed on February 2, 1996, charged Ricardo Hernandez with three counts of sexual assault committed against Lori Thorpe on December 19, 1995. Information K2/96-0095A filed on February 8, 1996, charged Mr. Hernandez with various felony offenses stemming from crimes committed against Lisa Torres on January 15, 1996. Information P2/96-0839A filed on March 12, 1996, charged Mr. Hernandez with felony assault by pellet gun committed against Amber Newberry on January 1, 1996.[1]

On January 1, 1997, the prosecution filed a motion asking the trial court to consolidate the three cases pursuant to R.I.Super.R.Crim.P. 13. At the hearing on March 24, 1997, the prosecution argued that consolidation would serve judicial economy. (PT 3/24/97, p.13) The prosecution also argued that the state could have joined the cases at the outset under R.I.Super.R.Crim.P. 8 because the various offenses were of the same or similar character, and parts of a common scheme or plan. (PT 3/24/97, pp. 7-8) The

---

[1] Although the criminal docket sheet indicates an offense date of January 15, 1996, Newberry testified that she reported the incident to police the day it happened on January 1, 1996. (TT II, 344) Newberry heard nothing from the police then contacted them again on January 16th. (TT II, 344,351)

prosecution also argued that the evidence supporting each case would be mutually admissible under R.I.R.E. 404(b) as it relates to the issue of identity. (PT 3/24/97, p. 13) The defense argued that joining the cases would be improper as a matter of law, and that the state's assertion that the evidence would be admissible at trial under R.I.R.E. 404(b), was purely speculative. (PT 3/24/97, pp. 17, 20) The defense also argued that consolidation would most likely cause prejudice to Mr. Hernandez because the state was trying to bolster the two weakest charges by trying them with the capital case, and strengthen all of the cases by improving the chance of guilty verdicts on all three cases. (PT 3/24/97, pp. 17-18, 20) Finally, the defense argued that the policy consideration of judicial economy should not trump the real probability of prejudice to Mr. Hernandez. (PT 3/24/97, 19-20) Justice Clifton reserved ruling and continued the matter for decision.

On March 31, 1997, Justice Clifton granted the state's motion to consolidate for reasons of judicial economy, that the evidence would be mutually admissible, that evidence of each crime would be admissible under 404(b) on the issue of identity, and that Mr. Hernandez had not demonstrated prejudice. (PT 3/31/97, pp. 1-5)

**Discussion**

R.I.Super.R.Crim.P. 13 gives a trial judge discretion to order two or more indictments, informations, or complaints tried together if the state could have charged the offenses, and defendants, if multiple, in a single charging document from the outset. Rule 8(a) governs joinder of offenses for trial when they are charged against a single defendant. *State v. Trepanier*, 600 A.2d 1311, 1315 (R.I. 1991). It allows joinder of crimes if (1) the offenses are "of the same or similar character;" or (2) if they are based on the same act/transaction or several acts/transactions connected together or part of a

"common scheme or plan." The determination concerning whether the counts are properly joined under Rule 8(a) is a legal determination that leaves no room for the exercise of discretion. *State v. Trepanier*, 600 A.2d 1311, 1316 (R.I. 1991). If joinder is not authorized under Rule 8(a), a defendant is entitled to separate trials as a matter of law. *Id.* Although judicial economy is a policy consideration, the purpose of Rule 8 is that it "acts as a safeguard against harassment of defendants and unfair prosecutorial advantage." *State v. Young*, 414 A.2d 185, 187 (R.I. 1980); *State v. Ride*, 444 A.2d 854, 855 at n.2 (R.I. 1982).

## A. **Same or Similar Character.**

This Court, in a number of cases, has provided guidance on when offenses are sufficiently similar to warrant joinder under Rule 8(a). Although the defendants in those cases on appeal challenged the trial court's denial of motions to sever pursuant to R.I.Super.R.Crim.P. 14, before reaching that issue, this Court would first decide whether joinder would be proper as a matter of law. In those cases in which the Court affirmed the trial court's denial of severance, the defendant typically had been charged either with multiple counts of the exact crime or of crimes of the same general nature.

In *State v. Whitman*, 431 A.2d 1229 (R.I. 1981), a case upon with Justice Clifton relied in granting the prosecution's motion to consolidate, the defendant was tried on eight counts of the abominable and detestable crime against nature, each involving young men 15 years or younger. This Court held the counts properly joined because the similarity of the offenses and the manner in which they were committed made evidence of each relative to prove the defendant's identity and motive. In *Whitman*, each count charged exactly the same activity: sodomy. Each offense was committed the same way:

by obtaining permission from each boy's parent to have him spend the night with Whitman, at his home or on a trip, at which time Whitman showed each boy sexually suggestive or explicit magazines. *id.* at 1231.

In *State v. Lassor*, 555 A.2d 339 (R.I. 1989), a case upon which the prosecution relied heavily, this Court affirmed the trial court's denial of the defendant's motion to sever offenses contained in a five-count indictment. Lassor was tried and convicted of three first-degree murders and with the first-degree sexual assault and attempted murder of a fourth victim. In addition to finding that the offenses relating to each victim were connected by a single interrogation, this Court found that the offenses all shared a similar character. Specifically, the Court noted that each offense involved the strangulation or attempted strangulation of the victim. Three offenses involved sexual assaults. Each offense was brutal and had a strong overtone of erotic motivation. Overall, there existed a "pattern of abhorrent sexual behavior coupled with strangulation and head injuries." *Lassor*, 555 A.2d at 345.

In *State v. Rice*, 755 A.2d 137 (R.I. 2000), the defendant was indicted with six counts of multiple sexual criminal acts committed against his minor stepdaughter and another child. On appeal, Rice challenged the trial court's denial of his motion *in limine* to sever some of the counts in the indictment, and that that failure resulted in prejudicial "spillover" evidence that strengthened the state's overall case when it did not have proof beyond a reasonable doubt on the charges separately. *id.* at 142. Before rejecting Rice's claim based upon a lack of prejudice, this Court found that the offenses had been properly joined under Rule 8(a) because they were of the same or similar character. In reaching that conclusion, the Court noted that "each and every count in [the] indictment related to

Rice's sexual assaults or solicitations for sexual acts upon one or more of [the] two young girls when they were present on the premises where Rice then resided." *Rice*, 755 A.2d at 143.

Similarly, in *State v. Waite*, 665 A.2d 1338 (R.I. 1995), this Court rejected the defendant's challenge to the trial court's refusal to sever one count of child molestation involving a girl under fourteen, from one count of second-degree sexual assault involving a young woman. This Court held, *inter alia*, that the offenses were sufficiently similar to be joined because they each involved the defendant sexually assaulting a young babysitter as she slept at night in his home.

And, in *State v. LaRoche*, 683 A.2d 989 (R.I. 1996), this Court found that it was proper for a trial court to deny LaRoche's motion to sever a count of obtaining money by false pretenses from one credit union from counts involving a second credit union. Six of the counts concerned conspiracy to obtain money from Davisville Credit Union by false pretenses, while the seventh count alleged conspiracy to obtain money from Rhode Island Central Credit Union by false pretenses. Because all of the allegations concerned the defendant's use of a "straw" borrower to circumvent credit union spending limits, this Court found that all the allegations against LaRoche were of the same or similar character, "inextricably intertwined with [a] common scheme and design." *id.* at 998. Indeed, the Court noted that "it would be difficult [to] imagine a scenario in which it would be more fitting to join counts [because] the scenes and players enmeshed in this drama beckoned to be presented on one stage." *id.* at 998.

Taking somewhat of an opposite view in *State v. Johnson*, 358 A.2d 370 (R.I. 1976), this Court refused the defendant's request to have the state try four indictments

simultaneously, reasoning that it was for the defendant's own good. In that case the state charged Johnson with larceny involving one house on the street where he lived, and burglary and two assaults at another house a little earlier. The state notified Johnson that it would try all offenses together but, on the day of trial, the prosecutor announced that he was proceeding only on the larceny charge. The defense objected, but the trial judge sided with the prosecution. In its Opinion, this Court first noted that control of the judicial docket rests in the court. *Johnson*, 358 A.2d at 456. The Court then noted that when multiple indictments pending are assigned to the same day, the prosecution can, all things being equal; choose which indictment to try first. *Id.* The Court continued by saying that "[a]n accommodation between these two propositions can best be obtained by adapting the rules relating to severance of cases to instances where a defendant seeks one trial where all charges pending against him will be resolved." *Id.* The Court ultimately concluded that the trial court did not abuse its discretion in refusing to join the offenses and that the defendant suffered no prejudice. In fact, the Court told Johnson that denying his request was for his own good. The Court reasoned:

> The burglary-assault indictments arose from an identical factual situation, while the living room entry incident evolved from separate and distinct circumstances. Separate trials may have safeguarded defendant from being prejudiced with the concurrent trial of the burglary-assault incidents *because the teacher's positive identification of him as the percher in her living room could not then be carried over and establish his guilt in the earlier incidents*. Simply put, we see no prejudicial error in the denial of the joinder motion. In fact, we believe that the trial justice's actions were a benefit rather than a detriment to defendant.

*Johnson*, 358 A.2d at 456-57 (Italics supplied).

The prejudice discussed in *Johnson* is precisely the type of prejudice that Mr. Hernandez sought to avoid by objecting to the state's motion to consolidate the three

indictments and informations. The only significant resemblance between the cases was that the complainants each claimed that Mr. Hernandez was their assailant. None of the significant facts and circumstances regarding the allegations made by each woman resembled those alleged by the two others.

In marked contrast to the *Whitman*, *Lassor*, *Rice*, *Waite*, and *LaRoche* cases, the crimes relating to the three women in this case were completely different. The offenses involving Lori Thorpe were completely sexual in nature, the offense relating to Amber Newberry was a felonious assault with a weapon similar to a firearm, and the offenses relating to Lisa Torres involved assault with intent to rob and to murder. The very general resemblances between the cases were, unfortunately, reflective of common crimes in urban areas, combined with the backgrounds and risky behavior of the women involved and the sad state of affairs in some neglected parts of the city of Providence. Rather than being so similar as to beckon consolidation, the crimes simply "fit into an obvious tactical pattern which would suggest itself to almost anyone disposed to commit a depredation of this sort." *McNight v. Maryland*, 375 A.2d 551, 557 (Md. 1977) (convictions of robbery, assault, and robbery with a dangerous or deadly weapon reversed because crimes were separate and distinct and evidence would not have been mutually admissible at separate trials).

In contrast to the preceding cases, in *State v. Trepanier*, 600 A.2d 1311, (R.I. 1991), this Court held that misjoinder occurred and the defendant was entitled to a new trial because the sniping or assault with intent to murder charges were not similar in character to the house-breaking and arson charges tried simultaneously. The Court also found that they did not disclose a common scheme or plan. In *Trepanier*, the defendant

and his confederate, Russell Ducharme, were charged with a series of shooting incidents and other crimes that occurred over a period of time. Ducharme was granted a new trial for the same reasons. *See, State v. Ducharme*, 601 A.2d 937 (R.I. 1991).

**B. Same Act/Transaction.**

The "same act/transaction" test is irrelevant here because the cases stemmed from crimes that occurred weeks apart and that involved three different complainants. *See, e.g., State v. King*, 693 A.2d 658 (R.I. 1997); *State v. Waite*, 665 A.2d 1338 (R.I. 1995); and *State v. Young*, 414 A.2d 185 (R.I. 1980).

**C. Connected Together/Common Scheme or Plan.**

While the joinder analysis at issue is clearly that of Rule 8(a) governing offenses, language of Rule 8(b) – which governs multiple defendants – is helpful. Rule 8(b) allows joinder of defendants when acts they commit are part of the "same series" and courts and commentators agree that the "same series"[2] language of Rule 8(b) is essentially identical in meaning to the "connected together" or "common scheme or plan" phrases of Rule 8(a). Wright, Federal Practice and Procedure: Criminal 2d (1991 Supp.) ¶144, p. 502.[3] *United State v. Jackson*, 562 F.2d 789, 796 (D.C. 1977) (same result required in determining whether attempted rapes and robberies were misjoined, regardless of whether Rule 8(a) "common scheme" or Rule 8(b) "same series" criteria employed). *See, also, King v. United States*, 355 F.2d 700, 704 (1st Cir. 1966), cited in Wright, *supra*, at p.

---

[2] This Court construed the "same series" phrase in *State v. Cassey*, 543 A.2d 670 (R.I. 1988), and held that joint participation by the defendants in acts occurring at the same time and place met the joinder requirements of Rule 8(b). *Cassey* is irrelevant here, as none of the crimes were committed at the same time.

[3] Both 8(a) and 8(b) are identical to their federal counterparts in relevant respect.

504-05 (holding that Rule 8(a) "common scheme" is subsumed within Rule 8(b) "same series"). Thus, cases involving either criterion are persuasive.

In that context, joinder of dissimilar counts generally occurs when the offenses arise from the same incident, as where a defendant is alleged to have raped and kidnapped the same victim in a continuing transaction. In more problematic cases, only a limited number of rationales justify joining dissimilar crimes.

In *Ray v. United States*, 472 A.2d 854 (D.C.App. 1984), the court identified four circumstances under which *dissimilar* offenses may be joined: (1) where the offenses were committed to achieve a specific, common goal; (2) where one offense led logically to the other; (3) where the offenses were all part of a common or single scheme, such that proof of them necessarily overlaps; and (4) where numerous counts are linked as overt acts of a single conspiracy, alleged by the government in good faith. *id.* at 858, n.7. *none* of these circumstances apply here.

**1. Common goal.**

In this case, there was no allegation that the three separate crimes were done in furtherance of any single goal. And, indeed, the court in *Ray*, *supra*, warned that the "specific common end" may not be as broad as simply stealing property. *Id.* In *State v. Tate*, 334 S.E.2d 289 (S.C.App. 1985), two separate forgery charges, arising from separate incidents, were joined for trial. The South Carolina Court of Appeals reversed, finding them misjoined because the incidents did not constitute a single course of conduct, were not proven by the same evidence, and had nothing in common except the fact that they were similar offenses (not itself a ground for joinder in South Carolina, although it is in Rhode Island).

*State v. McCrary*, 621 S.W.2d 266 (Mo. En banc 1981) is an example of a common "goal" or "motive" case. There, the defendant was motivated by revenge for the loss of his lover and her children; he committed fire-bombings, shootings, arsons and assaults during a four-month period, all arising from the same jealous rage. The *McCrary* court held the offenses properly joined "because they were connected by the continuing motive of revenge by harassment." *McCrary* at 271, cited in *State v. Smith*, 682 S.W.2d 861 (Mo.App. 1984). *See, also*, *United States v. Wilson*, 434 F.2d 494, 498 (D.C.Cir. 1970) (joinder of a variety of charges permissible, where all arose from a single robbery, including the getaway); *Cataneo v. United States*, 167 F.2d 820, 823 (4th Cir. 1948) (common goal connected offenses all committed fraudulently to obtain draft deferment for the same defendant); *State v. Couvion*, 655 S.W.2d 80 (Mo.App. 1983) (joinder proper of several persistent attempts to steal an automobile from the same place on different occasions).

**2. Logical Relationship.**

Similarly, there were no allegations in the government's proof of this case that any one crime led logically to the next. The connection, to meet this second and alternative criteria for joinder, must not be merely coincidental but *necessary*. *Davis v. United States*, 367 A.2d 1254, 1261 (D.C.App. 1976) (discrete rapes and kidnaps misjoined where not *necessarily* connected). *Compare*, *Brown v. State*, 385 N.E.2d 1148, 1151-52 (Ind. 1979) (joinder of theft and sodomy proper where defendant stole bike to give to a 10-year-old in return for sexual favors).

**3. Connected Together/Common Scheme or Same Series.**

The crimes do not meet the third criterion of "connected together." This phrase has generally been interpreted to permit joinder of offenses that are so intertwined that the proof of each essentially or completely overlaps.[4] This Court, construing the "connected together" clause of Rule 8(a), held that a defendant's escape from the ACI could be joined for trial with a murder committed while on escape status. In *State v. Cline*, 405 A.2d 1192 (R.I. 1979), the Court relied on the fact that evidence of each was "mutually admissible." *id.* at 1209. Because Cline was in jeopardy of a death sentence, evidence that he was "committed to confinement" was properly submitted to the jury for consideration in the murder. And, obviously, evidence that he was in Providence killing a fish peddler proved the escape, as it showed he was not in Cranston where he belonged.[5] *See, also, State v. Humphrey*, 715 A.2d 1265 (R.I. 1998) (evidence of prior conviction was necessary to support motive for separate shooting offense).

*State v. Colangelo*, 55 R.I. 170, 179 A. 147 (1935), decided decades before the adoption of Rule 8, squarely interprets "common scheme." It was not a joinder case at all, but instead raised admissibility of evidence of uncharged criminal conduct at the defendant's trial for being a "common cheat." The defendant was a self-appointed evangelical healer, who believed God had bestowed upon him a mission of treating "the

---

4 Mere overlapping of some evidence does not itself warrant joinder. In *Ray v. United States*, 472 A.2d 854 (D.C.App. 1984), the defendants mugged some acquaintances and then, 15 hours later, burgled a gas station. Even though they were wearing coats stolen in the robberies while they held up the gas station, the Court held that connection insufficient. The fact of the wearing of the coats 15 hours later could be admitted at the robbery trial to show they had stolen the, the Court agreed, but the additional fact that they were wearing the coats during the burglary would not be admissible.

5 *Cline* could have been decided differently, with the same result. The Fourth Circuit, for example, holds that mutual admissibility of evidence goes to harmlessness, not to whether misjoinder has occurred. *United States v. Seidel*, 620 F.2d 1006 (4th Cir. 1980).

sick, the lame and the disordered." *id.* at 171. Collecting money from the community, he established a "habitation" which he called the "House of God." *Id.*

Colangelo was charged with being a "common cheat," a common law offense requiring the state to prove a "deceitful or irregular practice." *id.* at 173. Considering the claim that evidence of immoral sexual activity was wrongfully admitted at trial, this Court held the evidence admissible to show the defendant's continuing fraudulent, bad faith behavior and intent. *id.* at 174. The disputed evidence was "connected with and form[ed] a link, directly or indirectly in a scheme to deceive and defraud." *Id.*

In *Colangelo*, the immoral sexual practices were contemporaneous with the financial dealings with which the defendant was charged were coincident in place as well as time, shared commonality of victims and – most important – shared fraudulent and deceitful intent, which was an element of the crime charged. Indeed, the fact that the defendant was engaged in "immoral sexual conduct toward females who were under his protection and care" itself tended to prove that the representations he made about his healing ability were in bad faith, the Court said. *Id.*

*Colangelo* at its heart and by its literal terms is merely an admissibility of evidence decision. But its definition of the word "scheme" is helpful here. The intertwining of the evidence which revealed that all of Colangelo's activities were parts of a single pattern simply does not exist in this case. Indeed, in *Colangelo*, the state had to prove a practice or continuing transactions, so the evidence of immoral sexual activity assisted in proving an element of the crime of being a "common cheat." In the instant case, no offenses common to a particular victim had anything to do with the other victims. In fact, although the prosecutor argued that the cases involved a common

scheme (PT 3/24/97, pp. 7-8), he cited absolutely no facts to support that argument. (*See generally*, PT 3/24/97, pp. 7-15, 20-21) The single fact that the prosecution cited to suggest that the cases overlapped, was that each woman alleged that Mr. Hernandez was her assailant. (*Id.*)

However, to be properly joined by virtue of overlapping evidence, the overlapping must be *substantial*. For example, defendants charged with transporting stolen goods may be properly joined with others charged with receiving those *same* goods. *United States v. Jackson*, 562 F.2d 789, 794-95 (D.C. 1977). In *United States v. Valentine*, 706 F.2d 282 (10th Cir. 1983), the Court held joinder proper where the defendant was charged with a variety of drug and firearms offenses. There, the cocaine and weapons had all been revealed during the course of a single, warranted search. The Court found the possession of drugs and guns parts of a "common scheme or plan." *id.* at 289.

In *United States v. Jackson, supra*, the Court found misjoinder of attempted rapes and robberies. There, the defendant followed two women leaving a Washington restaurant and accosted them in a deserted location; after a struggle, he fled. Just a few hours later, the defendant – accompanied by another man – followed two other people leaving the same restaurant and snatched their purses. The case arose in a peculiar posture, having to do with whether the federal court had jurisdiction of both offenses, as one was a purely municipal crime. The jurisdictional issue, however, depended strictly on whether the offenses were properly joined in a single indictment.

Holding that the offenses only shared temporal and spatial proximity, the Court found them to be "dissimilar and apparently unconnected crimes," not part of the "same

series." *id.* at 795. The Court noted its result would be the same if it were applying subsection (a)'s "connected together" or "common scheme" clauses. *id.* at 796. Central to the decision was the recognition that the offenses involved different intents, that a weapon was used in some but not others, and that the defendant was alone once and accompanied another time.

In the instant case, the only significant similarity between the crimes was the allegation that Mr. Hernandez was the assailant in each case. As to overlapping evidence, there is no possible theory upon which evidence from any one case could have been introduced at the trial of another. Not one piece of evidence, tangible or otherwise, connected the three totally unrelated crimes. *But cf.*, *State v. Martinez*, 774 A.2d 15 (R.I. 2000) (denial of defendant's motion to sever aiding and abetting charge from RICO-related offenses stemming from separate incidents a month apart because all counts related to defendant's collaboration with a certain group of individuals over a period of time with the common goal of seeking financial gain by stealing jewelry, then reselling the goods at the Golden Nugget Pawn Shop); *State v. Verecchia*, 766 A.2d 377 (R.I. 2001) (denial of defendant's motion to sever numerous counts against him upheld because offenses based upon same evidence and all related to his involvement in the criminal enterprise called the "Golden Nugget Group" based upon the group's relationship to the Golden Nugget Pawn Shop); and *State v. Hightower*, 661 A.2d 948 (R.I. 1995) (defendant suffered no prejudice where seemingly unrelated counts of murder, breaking and entering, larceny, forgery, counterfeiting, and unlawful burial were properly joined under Rule 8(a) because they were "inextricably intertwined with the common scheme and design of murdering an entire family").

**4. Single Conspiracy.**

Finally, as to the fourth criterion, the United States Supreme Court has held that joinder is unquestionably proper when dissimilar offenses are overt acts committed in furtherance of a single conspiracy. *Schaeffer v. United States*, 362 U.S. 511 (1960). *See also*, *State v. Kropke*, 303 A.2d 346, 349 (N.J.Super. 1973). This criterion is completely irrelevant because the state never raised the issue of a conspiracy.

## II. EVEN IF THE CASES WERE CONSOLIDATED PROPERLY, THE HEARING JUSTICE SHOULD HAVE SEVERED THEM BECAUSE THERE WAS REAL AND ACTUAL PREJUDICE CAUSED BY THE JURY INFERRING CRIMINAL DISPOSITION AND CUMULATING EVIDENCE OF GUILT WHEN THREE WEAK CASES WERE COMBINED TO INCREASE THE CHANCE OF GUILTY VERDICTS.

The major focus of the state in arguing for consolidation and of Judge Clifton, who granted the state's motion, was that Mr. Hernandez could not demonstrate prejudice under Superior Court Criminal Rule 14. (PT 3/24/97, pp. 14-15, 20-21; PT 3/24/97, pp. 23-24, 26-27)

Rule 14 of the Rhode Island Rules of Criminal Procedure provides for relief from joinder of offenses or of defendants which, although proper under Rule 8 or 13, would nonetheless prejudice either the defendant or the state. Rule 14's expansive language provides relief from joinder upon showing of prejudice arising from the facts and circumstances of the case. The demonstration of prejudice must be sufficiently great to overcome the presumption that offenses or defenses properly joined should be tried together. *State v. Goodreau*, 560 A.2d 318 (R.I. 1989). The motion is addressed to the sound discretion of the trial justice. *Id.*; *State v. Patriarca*, 308 A.2d 300 (R.I. 1973). The prejudice must be "substantial," *State v. Whitman*, 431 A.2d 1229, 1233 (R.I. 1981), or "real," *State v. Sharbuno*, 390 A.2d 915 (R.I. 1978), as opposed to "potential," *State v. Whitman*, *supra*, at 1233, or "abstract." *State v. Gibbons*, 418 A.2d 830, 835 (R.I. 1980); *See also*, *State v. Patriarca*, *supra*, at 29. A defendant has the burden of proving abuse of discretion by demonstrating that he or she suffered actual and substantial prejudice because of joinder. *State v. Cassey*, 543 A.2d 670 (R.I. 1988); *State v. Bernier*, 491 A.2d 1000 (R.I. 1985); *State v. Whitman*, 431 A.2d 1229 (R.I. 1981); *State v. Patriarca*, 308

A.2d 300 (R.I. 1973). Substantial prejudice occurs when there exists real doubt about how the trial judge's refusal to sever may have affected the jury. *State v. Evans*, 742 A.2d 715 (R.I. 1999).

### A. **Judicial Economy**.

The Court must weigh prejudice to the defendant caused by joinder against policy considerations of economy and expedition in judicial administration. *State v. Patriarca*, 308 A.2d at 311. Generally, such prejudice falls into one or more of three categories: (a) that the defendant may be embarrassed or "confounded" in attempting to present different defenses; (b) that the jury may infer a criminal disposition on the part of the defendant; or (c) that the jury may cumulate evidence of guilt. *State v. Patriarca*, 308 A.2d 300, 311 (R.I. 1973), citing, *Drew v. United States*, 331 F.2d 85 (D.C. Cir. 1964).

Judge Clifton granted the state's motion to consolidate because he found that no prejudice would result because Mr. Hernandez did not assert that he had planned to, but would be unable to testify as to a particular offense should the cases be joined – i.e., that he would confounded in his defense. However, Judge Clifton overlooked the two other categories of prejudice that this Court has mentioned in past cases, *supra*.

In fact, it is the second and third types of prejudice – that the jury might infer a criminal disposition on the defendant's part and/or cumulate evidence of guilt – that are implicated here.

#### (1) **Mutually Admissible**.

This Court has held, consistently with other courts, that the second type of prejudice is averted or mooted if the evidence on all counts is "mutually admissible." That is, if, at a separate trial of each count, the government could introduce evidence of

the defendant's commission of the crimes charged in all other counts, there is no prejudice since each jury would hear evidence of all crimes whether joined or severed. *E.g.*, *State v. LaRoche*, 683 A.2d 989 (R.I. 1996).

Mutual admissibility may be met in one of two ways. First, it may occur where the traditional standards for admissibility of other crimes evidence are met. R.I.R.E. 404(b) (evidence of other crimes may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident ...."); *State v. Lamoureux*, 623 A.2d 9 (R.I. 1993); *State v. Cardoza*, 465 A.2d 200 (R.I. 1983); *State v. Jalette*, 382 A.2d 526 (R.I. 1978); *State v. Colangelo*, 179 A.2d 147 (R.I. 1935). Most frequently, joinder of multiple offenses is justified by the existence of a common scheme or plan. *See, e.g.*, *State v. LaRoche*, 683 A.2d 989, 998 (R.I. 1996) (allegations against defendant were all "inextricably intertwined with the common scheme and plan beckoning to be presented on one stage"); *State v. Hightower*, 661 A.2d 948, 955 (R.I. 1995) (all counts were "inextricably intertwined with the common scheme to murder an entire family"); *State v. Waite*, 665 A.2d 1338 (R.I. 1995) (per curiam) (the two sexual assaults against children were sufficiently similar in character to justify joinder); *State v. Rosado-Lugo*, 591 A.2d 1219 (R.I. 1991) (per curiam) (three drug offenses were sufficiently similar to be tried together); *State v. Lassor*, 555 A.2d 339 (R.I. 1989) (the crimes were sufficiently similar so as to show a common scheme or plan, with a definite overlap in evidence).

Second, mutual admissibility may occur where the elements of offenses overlap. For example, in *State v. Cline*, 405 A.2d 1192 (R.I. 1979), one of the two cases that Judge Clifton relied upon, the defendant was charged with having committed a murder at the

Chad Brown Housing Project while "committed to confinement" at the Adult Correctional Institutions, and, by separate indictment, was charged with having escaped from such confinement. The defendant objected to the state's consolidation of the charges for trial and moved for severance. The Court reasoned that at the murder trial, the jury would be entitled to hear that the defendant escaped since a necessary element of proof in the murder indictment was that Cline was "committed to confinement" at the time of the alleged crime. Conversely, the state could prove the escape charge at a separate trial by showing that the defendant was in fact engaged in an act of murder in the City of Providence when he was supposed to be in prison. Otherwise, the jury could not have understood how a defendant who was committed to confinement at the ACI could have been present at the Chad Brown Housing Project at the time of the crime: "We know of no doctrine in the law that is designed to insulate defendant from relevant truths." *State v. Cline*, 405 A.2d at 1210. Thus, since each jury in separate trials would hear evidence of the other crime, the offenses were "mutually admissible" and the Court held there was no prejudice from their being jointly tried.[6]

In *State v. Hatfield*, 380 S.E.2d 670 (W.Va. 1988), the danger of prejudice to a defendant outweighed the convenience to the state of a single trial on two charges of abduction with intent to defile, and the charges should have been severed because the

---

[6] Some of the language in *Cline* could be read to suggest that the standards for mutual admissibility and Rule 8 joinder are essentially congruent. Such an interpretation, however, would confuse two standards which, though facially similar, have different functions and scopes. "Mutual admissibility" is a rationale used to justify the denial of a severance motion where, because the prejudicial evidence would be admissible even at separate trials, the motion would be futile. On the other hand, joinder under R.I. Rule Crim.P. 8 does not depend on mutual admissibility, but rather on the close relationship of the offenses. Offenses joinable under Rule 8 may or may not be mutually admissible;

offenses were separate and distinct – they were not so similar in nature that evidence of one crime would have been admissible at a separate trial for the other. The offenses occurred ten days apart and one involved a minor male and the other involved an adult female. In addition, the manner of abduction differed.

In *United States v. Desantis*, 802 F.Supp 794 (D.C.N.Y. 1992), the court ruled that a count charging the defendant with violation of the statute barring possession of a firearm by a previously convicted felon should be severed from other counts. The court stated that the federal judiciary should not encourage or countenance the use of the statute as a means of informing the jury of a defendant's prior convictions merely by taking the time to include a charge of firearms possession. In *United States v. Foutz*, 540 F.2d 733 (4th Cir. 1976), the Fourth Circuit Court of Appeals declared an abuse of discretion for refusing to sever the trials of two robberies because they were not so similar that evidence of one would have been admissible at a trial of the other.

For reasons discussed, *supra*, this simply is not a case where any of the evidence overlapped. It is a case that involves completely different crimes, committed against three totally unrelated women, on three separate occasions during the course of a month. There is nothing in the record to suggest that, had the cases been tried separately, there would have been overlapping or mutually admissible evidence. When reviewing the record, however, it is easy to understand why the state decided at the eleventh hour to consolidate the three cases. Each case was based solely upon the eyewitness testimony and credibility of the complaining witnesses. Each witness presented significant challenges for the state, individually. Thorpe was an admitted drug addict whose reasons

---

and conversely, mutually admissible offenses, while often joinable, need not necessarily

for her bizarre travels during a blizzard, and for not trying to escape while traveling very slowly on a highway full of cars also traveling the same speed, when the door was unlocked and the assailant had not brandished a weapon, and needed both hands and feet to drive his standard automobile. Newberry and Torres also told bizarre stories and were admitted prostitutes "tricking" for drug money on the days of their assaults. Individually, the state would not have presented a strong case to a jury. However, how could three women (however tarnished) pointing to the same defendant in a courtroom, be wrong? The state sought strength in numbers.

**(2) <u>Harmless error.</u>**

In order to determine whether the misjoinder which occurred here was harmless, *United States v. Lane*, 474 U.S. 438 (1986), this Court must be able to say that the exposure of the jury to three totally unrelated crimes within one trial could not possibly have affected its verdicts with respect to all crimes. In other words, this Court must be able to say that a jury deciding whether Mr. Hernandez was the perpetrator in any or all of the cases would not have been swayed in the least by three women filling in gaps of inadequacies for each other, by assuming that if they all accused Mr. Hernandez, it must be true. There simply is no way to dispute this real and actual prejudice. Therefore, should this Court find that the cases were properly joined under Rule 8; it should find that the prejudice caused to Mr. Hernandez by the consolidation outweighed any imagined notions of judicial economy.

---

be so.